# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0158V

|  |  |
|---|---|
| MONIQUE SAMAYOA,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: May 7, 2025 |

*Amy A. Senerth*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Emily Hanson*, U.S. Department of Justice, Washington, DC, for Respondent

## **FINDINGS OF FACT**[1]

On January 6, 2021, Monique Samayoa filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving an influenza ("flu") vaccine on October 16, 2019. Petition at 1, ¶ 2. Although the vaccine record in this case does not include information pertaining to the site of vaccination,[3] Petitioner alleges that

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Exhibit 5. It shows only that the flu vaccine was administered intramuscularly on October 16, 2019. *Id.* at 2.

the flu vaccine was administered in her left deltoid. *Id.* at ¶ 2. She also maintains that "[her] left shoulder injuries and sequelae lasted more than six (6) months." *Id.* at ¶ 11.

For the reasons discussed below, I find Petitioner likely received the flu vaccine in her left arm as alleged. However, Petitioner must provide additional evidence to establish that she has satisfied the Vaccine Act's severity requirement, or that she has met all requirements for a Table SIRVA.[4]

## I.   Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consider ation as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that

---

[4] *See* Section 11(c)(1)(D)(i) (statutory six-month severity requirement); 42 C.F.R. § 100.3(a)XIV(B) & (c)(10) (2017) (the requirements for a Table SIRVA); *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005) (setting out the three-pronged test which must be met to establish causation).

2

happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## II. Finding of Fact

I make the finding regarding site of vaccination after a complete review of the record to include all medical records, affidavits, documentation, briefing, and additional evidence filed. Specifically, I base the finding on the following evidence:

- Prior to vaccination, Petitioner suffered common illnesses and conditions such as sinusitis, kidney stones, and gastroesophageal reflux. Ex. 2 at 8-

803. Right hand dominant, she experienced tenosynovitis[5] in her right wrist in early 2019, and tarsal tunnel syndrome[6] in her left ankle in the fall of 2016. *E.g.,* Ex. 1 at 22 (left ankle complaint); Ex. 2 at 769 (right wrist complaint). There is no evidence that she suffered any issues related to her left shoulder prior to vaccination.

- On October 16, 2019, Petitioner received the flu vaccine alleged as causal at her place of employment. Exs. 5, 7. The vaccine record states only that she received the flu vaccine intramuscularly. Ex. 5 at 2; *see also* Ex. 7 (showing Petitioner's attempts to obtain the needed site of administration).

- On November 2, 2019 (seventeen days post-vaccination), Petitioner was seen for a workers' compensation complaint, stating that the flu vaccine "was given in her left upper arm but since then it has been very sore." Ex. 4 at 6. She reported that "she can barely lift her arm, [h]as decreased range of motion, [and] [a]lso has tingling down [the] arm to elbow." *Id.* Noting that she does not have to lift or restraint patients during her work as a mental health technician with troubled kids, Petitioner theorized that her symptoms must be linked to the flu vaccine she received. *Id.* Observing "diffuse tenderness about the left deltoid area" (*id.* at 7), the doctor treating her administered a steroid injection and instructed her to return in a few days for re-evaluation. *Id.* at 7-8.

- During the morning of November 4, 2019, Petitioner submitted an incident report by phone, providing additional details regarding the events that occurred when she received the vaccine. Ex. 4 at 2. Petitioner again stated that the vaccine was administered in her left arm. *Id.* It was noted that she was "sent home early yesterday, 11/3/19" and was missing work that day. *Id.* at 3.

- Later that same day (November 4th), Petitioner attended the workers' compensation follow-up appointment for left shoulder pain that was noted to be "persistent since her flu shot 3 weeks ago." Ex. 4 at 9. Stating that she "can feel a knot in her upper arm," she described constant pain, "throbbing

---

[5] Tenosynovitis is the "inflammation of a tendon sheath." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1882 (32th ed. 2012).

[6] Tarsal tunnel syndrome is "a syndrome of overuse injury with a complex of symptoms resulting of compression of the posterior tibial nerve or of the plantar nerves in the tarsal tunnel, with pain, pain, numbness, and tingling paresthesia of the sole of the foot." DORLAND'S at 1850.

4

and tingling down her arm, [l]imited ROM[7] without pain, and a [sic] all over heavy feeling." *Id.* at 9. Petitioner was prescribed pain medication and provided an orthopedic referral. *Id.* at 10.

- The next day (November 5, 2019), Petitioner visited the emergency room ("ER"), complaining of throbbing left shoulder discomfort that started after she received the flu vaccine at work. Ex. 2 at 840. She reported that she had two urgent care visits with no improvement and had been referred to orthopedics, but not seen yet. Petitioner was diagnosed with acute left shoulder pain and told to follow-up with orthopedics as previously instructed. *Id.* at 844-45.

- On November 14, 2019, Petitioner returned to the ER, concerned about a lump she discovered in the left groin area. Ex. 2 at 914. She was diagnosed with a cyst of the left Bartholin gland,[8] prescribed antibiotics, and instructed to return if the cyst increased in size or her condition otherwise worsened. *Id.* at 918-19, 927. There is no mention of left shoulder pain at this visit.

- On November 18, 2019, Petitioner visited the orthopedic clinic where she received treatment for her left ankle condition in 2016, complaining of left shoulder pain that began immediately after she received a flu shot at work. Ex. 1 at 20. Estimating her current pain as ten out of ten, she described diffuse pain around her shoulder that sometimes radiated down her arm and intermittent tingling and numbness in her fingertips. *Id.* Noting that Petitioner had "a very remarkable exam" and no symptom improvement after a steroid injection, the orthopedist ordered an MRI and physical therapy ("PT"). *Id.* at 21.

-  Petitioner returned to the ER on November 23, 2019, for further treatment of her Bartholin cyst which had worsened. Ex. 2 at 990. The ER physician drained the cyst, and prescribed further medication. *Id.* at 993. There is no mention of left shoulder pain at this visit.

- On November 27, 2019, the North Carolina Industrial Commission ("NCIC") determined that Petitioner was entitled to payment for her vaccine-related left shoulder pain pursuant to her workers' compensation claim. Ex. 4 at 50.

---

[7] ROM stands for range of motion. MEDICAL ABBREVIATIONS at 521 (16th ed. 2020).

[8] "A Bartholin cyst is a firm, round bump near the opening to your vagina." *See* https://my.clevelandclinic.org/health/diseases/17737-bartholin-cyst (last visited May 5, 2025).

- On December 16, 2019, Petitioner attended her first PT session. Ex. 3 at 4-8. She again described left shoulder pain since receiving the flu vaccine on October 16th, along with numbness and tingling to her fingertips. *Id.* at 4. It was noted that Petitioner was unable work or perform functional tests: repetitive and overhead reaching and grasping. *Id.* Reporting a maximum pain level of ten, Petitioner exhibited reduced strength and ROM. *Id.* at 4-5.

- Two days later, Petitioner attended her second PT session. Ex. 3 at 9-10. Exhibiting the same abilities and limitations in strength and ROM (*id.*), Petitioner was noted to have tolerated treatment "with moderate complaints of pain" (*id.* at 10).

- Petitioner did not show for PT sessions scheduled for December 24 and 26, 2019. Ex. 3 at 11-12.

- At her PT re-evaluation on December 31, 2019, Petitioner exhibited the same strength deficits and inability to perform specific tasks, but improvements in ROM. Ex. 3 at 13-14. It was recommended that she attend two PT sessions weekly for four weeks. *Id.* at 15-16.

- On January 8, 2020, Petitioner underwent an MRI of her left shoulder which revealed mild cuff tendinopathy and peritendinobursitis,[9] mild AC joint degeneration, and no cuff, labrum, or biceps tear. Ex. 1 at 95.

- In early January 2020, Petitioner either rescheduled or failed to show for three PT sessions. Ex. 3 at 18-19, 23. She attended only one PT session on January 9, 2020. *Id.* at 20-22. In the record from that session, it was noted that Petitioner "tolerated today's treatment intervention with mild complaints of pain." *Id.* at 22.

- At her next re-evaluation on January 15, 2020, it was noted that Petitioner continued to be unable to work, but could perform two of the three occupational tasks (repetitive reaching and grasping) for up to ten minutes. Ex. 3 at 24. Although she continued to report a maximum pain of ten, Petitioner exhibited improvements in strength and ROM. *Id.* at 24-25. It was

---

[9] This term appears to refer to both tendonitis, also known as tendinitis: "inflammation of tendons and of tendon-muscle attachments" (DORLAND'S at 1881) and bursitis: "inflammation of a bursa" (*Id.* at 264). Peritendineum is "the connective tissue investing larger tendons and extending as a septa between the fibers composing them." DORLAND'S at 1418. Peritendinitis is another term for tenosynovitis. *Id.*; *see infra* note 5 (defining this condition which was the diagnosis for Petitioner's right wrist symptoms in early 2019).

6

recommended that she attend PT session twice weekly for three additional weeks. *Id.* at 27.

- Petitioner's condition remained the same during PT sessions on January 17 and February 5, 2020. Ex. 3 at 30-31, 36-37. She was described as tolerating treatment "with moderate complaints of pain" at both sessions. *Id.* at 32, 38.

- During this time, Petitioner also failed to show for three PT sessions. Ex. 3 at 33-35.

- On January 31, 2020, Petitioner visit her orthopedist to discuss the results of her January 8, 2020 MRI. Ex. 1 at 14. She again reported immediate pain after receiving the flu vaccine at work on October 16, 2019. Rating her pain as eight out of ten, Petitioner described it as constant, stabbing, shooting, and achy pain, adding that she also experienced popping and pain radiating to her elbow. Maintaining that her condition was worsening, she stated that her ROM had improved with PT, but denied any pain relief. *Id.*

- Upon examination, the orthopedist observed lateral cuff insertion tenderness and limited ROM with pain. Ex. 1 at 15. Noting that the MRI showed an intact rotator cuff and no evidence of persistent pain, the orthopedist recommended Petitioner continue her conservative care and prescribed a topical gel and pain medication. *Id.*

- At her next re-evaluation on February 10, 2020, Petitioner continued to be unable to work. Ex. 3 at 39. Although her maximum pain levels and ability to perform occupational tasks remained the same, she again exhibited improvement in strength and ROM. *Id.* at 39-40. It was recommended that she continue to attend PT sessions twice weekly for four weeks. *Id.* at 42.

- Petitioner continued to exhibit improvements in strength and ROM during two more PT sessions on February 10 and 19, 2020. Ex. 3 at 43-44, 46-47. Still unable to perform overhead reaching, Petitioner was able to perform repetitive reaching and grasping for eleven to twenty minutes. *Id.* at 43, 46.

- Petitioner again failed to show for PT sessions scheduled for February 12 and 20, 2020. Ex. 3 at 45, 49.

- At the next PT re-evaluation (performed on February 26, 2020), findings like those observed during Petitioner's two PT sessions that month were again

7

obtained. Ex. 3 at 50. It was noted that Petitioner had not returned to work, had "made minimal progress since [her] last re-eval, and [that her] attendance ha[d] been inconsistent." *Id.* at 50, 52.

- On February 14, 2020, Petitioner's workers' compensation carrier petitioned the NCIC to compel Petitioner to comply with her medical treatment, specifically to attend PT. Ex. 184-85. On March 2, 2020, the NCIC ordered Petitioner to pursue treatment or face suspension of compensation. Ex. 4 at 238.

- Petitioner attended her twelfth and last PT session on March 4, 2020. Ex. 3 at 60-62. It was noted that she "tolerated today's treatment intervention with mild complaints of pain." *Id.* at 62.

- Petitioner failed to show at for her next PT session, scheduled for March 6, 2020. Ex. 3 at 63.

- On April 25, 2020, Petitioner visited the ER seeking treatment for constipation and lower back pain for the last two days. Ex. 2 at 1065. There is no mention of left shoulder pain in the record from this visit.

- Petitioner was formally discharged from PT on May 7, 2020. Ex. 3 at 64. It appears she had not returned as the record states that the therapist was "[u]able to assess [her] current understanding of prognosis . . . [and]home exercises program due to not completing plan of care." *Id.* at 65. All goals were marked as abandoned as of the discharge date. *Id.*

- On May 18, 2020, Petitioner's orthopedist returned a questionnaire first sent to him by the workers' compensation carrier in early February 2020. Ex. 4 at 291-93. The orthopedist opined that Petitioner's ongoing left shoulder pain was not causally related to the flu vaccine she received, that she had reached maximum improvement, that she could return to work, and that she had no permanent impairment. *Id.* at 292-91.

- The parties underwent an unsuccessful mediation for Petitioner's workers' compensation claim on May 20, 2020. Ex. 3 at 296-97. However, they later were able to agree upon a payment of $3,500.00 to cover all expenses incurred prior to July 14, 2020. *Id.* at 324-36. The agreement incorporated the orthopedist's findings communicated in May, and was signed by the parties on July 27, 2020. *Id.* at 326, 335-36. The $3,500.00 amount appears

8

- to be based upon a total of $4,870.36 paid for expenses incurred through February 17, 2020. *Id.* at 340. The NCIC accepted the agreement on July 27, 2020. *Id.* at 337-38.

- During the subsequent six-month period, Petitioner visited the ER on four occasions: for a rash on June, 19, 2020; back pain on July 21, 2020; a headache, congestion, and nasal drainage on September 10, 2020; and the feeling of a foreign body in her right nostril on January 8, 2021. Ex. 2 at 1145, 1245, 1354, 1448. There is no mention of left shoulder pain in the medical records from any of these visits. *Id.* at 1105-1479. And no further medical records have been filed.

- In her declaration, signed under penalty of perjury pursuant to 28 U.S.C.A. § 1746 on March 14, 2023, Petitioner recounts the details surrounding her receipt of the flu vaccine on October 16, 2019, which mirrors the history she provided in her workers' compensation complaint. Ex. 8 at ¶ 3; *see also* Ex. 4 at 2. She again insists that she received the vaccine in her left arm. *Id.*

- Maintaining that she did not seek treatment beyond March 4, 2020, due to her workers' compensation carrier's refusal to provide further compensation, her lack of medical insurance, and her medical treaters representations that nothing more could be done. Ex. 8 at ¶¶ 4-5. Petitioner insists that she continues to experience left shoulder pain daily at a level of seven to eight out of ten. *Id.* at ¶ 6.

The above medical entries establish that when seeking treatment, Petitioner consistently identified her left shoulder as the problem, and attributed her pain to the flu vaccine she reported receiving in her left arm. She provided these histories (beginning seventeen days post-vaccination and throughout her treatment) to her employer, the physician treating her pursuant to her workers' compensation claim, an ER physician, her orthopedist, and her physical therapists. In both her workers' compensation complaint and signed declaration, Petitioner described the flu vaccine as improperly administered in her left deltoid. And her employer and workers' compensation carrier both accepted Petitioner's claimed left shoulder situs.

While originating from Petitioner, these statements are also set forth in contemporaneous records, and should therefore be afforded greater weight than any subsequent assertion or witness statement. The Federal Circuit has stated that "[m]edical records, in general, warrant consideration as trustworthy evidence . . . [as they] contain information supplied <u>to</u> or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras*, 993 F.2d at 1528 (emphasis added). Thus, the Circuit has

instructed that greater weight should be accorded to this class of information, even when the record in question simply memorializes what the petitioner said at the time.

Although the vaccine record does not set forth the exact site of vaccination, it clearly establishes that on October 16, 2019, Petitioner received an intramuscularly administered flu vaccine. Furthermore, the medical histories provided by Petitioner in the contemporaneously-created medical records and supporting evidence from her medical providers supply persuasive evidence supporting the conclusion that the vaccine was likely administered in Petitioner's left deltoid. By contrast, there is a dearth of evidence indicating that the vaccine was administered in any other location. I thus determine, based on the entire record, that Petitioner has provided preponderant evidence establishing that the flu vaccine to which Petitioner attributes her SIRVA was most likely administered in her left deltoid on October 16, 2019.

### III.     Scheduling Order

Although I have ruled in Petitioner's favor on the issue of situs, Respondent still opposes compensation. Rule 4(c) Report at 1, 15. He argues that Petitioner has also failed to satisfy the Vaccine Act's six-month severity requirement, or the third criterion for a Table SIRVA injury. *Id.* at 10-12; *see* Section 11(c)(1)(D)(i); 42 C.F.R. § 100.3(c)(10)(iii).

Expert testimony may be needed to address these issues. Petitioner has provided credible reasons for her failure to seek medical treatment past March 2020. And her actions during the remainder of 2020, and early 2021 - seeking medical care only through ER visits - supports her assertions. But she failed to mention any ongoing left shoulder issues at these appointments, or to seek treatment at the ER for her shoulder condition.

Additionally, Petitioner's condition prior to and after her last PT session on March 4, 2020 (less than five months post-vaccination) is difficult to ascertain based upon the record as it currently stands. Specifically, Petitioner's descriptions of severe pain run counter to her failure, not adequately addressed, to attend over one-half of the scheduled PT sessions. Such a failure to pursue medical treatment is usually indicative of a milder shoulder injury. Additionally, Petitioner's reported pain levels remained severe despite improvements in strength and ROM gained during PT session attended, during which she experienced only mild to moderate pain.

Furthermore, some of the symptoms Petitioner reported (for example numbness and tingling traveling to her fingertips, as well as her MRI results) further complicated both remaining issues. After reviewing the MRI results, Petitioner's orthopedist noted no evidence of her persistent pain.

Although her workers' compensation carrier originally found Petitioner entitled to a damages award, the carrier clearly disputed a causal link between the vaccine she received and at least her later symptoms. And the May 2020 medical opinion from Petitioner's orthopedist, although lacking important details regarding its basis and timing, supported that contention. Further, the informal workers' compensation agreement appears to be based upon a vaccine-related injury through only February 17, 2020, only four months post-vaccination.

Still, Petitioner's injury was compensated by her workers' compensation carrier. And some of the documentation related to the agreement supports a longer lasting injury. Specifically, the agreement indemnifies the carrier through late July 2020.

## Conclusion

Based on the foregoing, there is sufficient litigative risk on both sides to make exploration of settlement wise. At the same time, however, Petitioner should provide additional argument and the evidence needed to support her assertions of a Table injury and six-month sequalae, short of expert testimony.[10] And Respondent should more clearly explain his arguments related to Petitioner's Table claim.

**Petitioner's motion for a factual finding regarding the site of vaccination is <u>GRANTED.</u> The parties should file a joint status report, updating me on their settlement discussions, by no later than <u>Wednesday, June 11, 2025</u>. In the report, they should state whether they wish to continue their settlement discussions.** Even if settlement discussions are ongoing, deadlines for the parties' further evidence and argument will be set at that time.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[10] However, Petitioner may (and should) seek clarification from the orthopedist who opined that her later symptoms were not vaccine-related.

11